UNITED STATES *v.* D. H. ARMAGHANIAN (No. 4234)[1]

---

[1] C. A. D. 81.

United States Court of Customs and Patent Appeals, November 29, 1939

*Webster J. Oliver*, Assistant Attorney General (*Richard E. FitzGibbon*, special attorney, of counsel), for the United States.

*Eugene F. Blauvelt* (*Samuel M. Richardson* of counsel) for appellee.

[Oral argument October 4, 1939, by Mr. FitzGibbon and Mr. Richardson]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

BLAND, Judge, delivered the opinion of the court:

The United States has appealed here from a judgment of the United States Customs Court, Second Division, which sustained the importer-appellee's protest which he filed as the basis of an action to recover certain claimed excess duties paid the United States by what the appellee regards as an erroneous classification by the Collector of Customs at the port of New York of his merchandise, imported from Japan on September 1, 1936.

The imported merchandise consists of certain silk cloth invoiced as "100% silk plain cloth." The collector classified the same under paragraph 1205 of the Tariff Act of 1930 as "Woven fabrics in the piece, wholly or in chief value of silk, not specially provided for, 55 per centum ad valorem." In his protest and before the trial court, the importer claimed, among other things, that the merchandise was dutiable under paragraph 1205 as "Silk bolting cloth, not specially provided for, 30% ad valorem" in accordance with the Reciprocal Trade Agreement between the United States and Switzerland, 49 Stat. 3917 (hereinafter referred to as the Swiss Trade Agreement), and the generalization clause contained in section 350 (a) of the Tariff Act of 1930, as amended by the Trade Agreement Act of June 12, 1934 (48 Stat. 943).

In this court, appellee relies solely upon the claim that the merchandise is dutiable at 30 per centum under paragraph 1205 by virtue of the generalization clause above referred to.

The material statutory and trade agreement provisions follow:

*Tariff Act of 1930:*

PAR. 1205. Woven fabrics in the piece, wholly or in chief value of silk, not specially provided for, 55 per centum ad valorem; * * *.

*Reciprocal Trade Agreement Act:*

Sec. 350 (a) * * * The proclaimed duties and other import restrictions shall apply to articles the growth, produce, or manufacture of all foreign countries, whether imported directly, or indirectly: * * *

*Swiss Trade Agreement* (signed by the parties January 9, 1936; effective date February 15, 1936):

· 1205. Silk bolting cloth, not specially provided for, 30% ad val.

The number "1205," as used, indicates the number of the paragraph of the Tariff Act of 1930.

At the trial below, the importer introduced the testimony of one witness; the Government none. No sample of the merchandise was submitted. From the testimony of the sole witness in the case, Dicran Armaghanian, the importer-appellee, we quote all that we regard as pertinent in deciding the issue at bar:

Q. How long have you been in this business, Mr. Armaghanian?—A. In this particular line of silk business, you mean?

Q. All right, limit it to that.—A. I have been in the silk business for the last twenty years; before I came to this country.

Q. What do you include in your classification of silk business?—A. Well, I have in the Old Country I had dress goods as well as cloth for bolting purposes for making sifters and screens.

Q. Do you now import bolting cloth?—A. That is my main business.

*       *       *       *       *       *       *

Q. I will ask you: What is the cloth covered by this invoice in suit?—A. It is bolting cloth.

Q. Is that cloth used for bolting or sifting?—A. It may be used for bolting or sifting; it may be used for passing through liquids or paints or dyes or any liquid or near liquid or in powder form.

Q. Will you please state whether or not the merchandise in suit is all silk?—A. It is all pure silk.

Q. Is it sized or unsized?—A. It is natural.

Judge DALLINGER. What do you mean by "natural?"

The WITNESS. Not sized; it is natural.

Judge DALLINGER. That is what he asked you, whether it was sized or unsized.

By Mr. CARTER:

Q. Do you know whether the merchandise in suit is gauze woven?—A. I don't understand what you mean by "gauze woven."

Q. Do you know the meaning of the word "leno?"—A. No; I do not. "Leno" means line.

Q. Do you know the meaning of the term "line woven?"—A. It means "line woven."

Q. Is the merchandise in suit leno woven?—A. Yes; line woven.

Q. Do you know whether the merchandise in suit is bleached?—A. No.

Q. You don't know?—A. I don't know whether it is bleached or not.

Q. Have you ever followed the sale of the merchandise in suit into consumption and seen it used?—A. Yes.

Q. How have you seen it used?——

\*     \*     \*      \*     \*     \*     \*

A. It is always used on screens. It is made into a frame, always put on a frame. Otherwise, they could not use it. It is not good for anything else.

Judge DALLINGER. You mean you have seen it used that way in this country?

The WITNESS. Always.

Judge DALLINGER. I say you mean you have seen it used that way in this country?

The WITNESS. Yes, sir; always.

By Mr. CARTER:

Q. For what purpose have you seen it used?—A. I have seen it being used for passing through pigments in the form of paint. I have seen it used for straining syrup. I have seen it being used for straining paint and other things in order to get it fine, even get liquid out of it. Almost every shop that does that kind of painting has it. They have special screens made out of it to pass the paint through before they start painting.

Q. You spoke of sifting pigments in the form of paint. Is that a dry mixture?—A. It may be mixed with paint. It may be mixed with water colors. It may be anything at all.

Q. Is it dry or wet?—A. It is in a dry condition, but I have also seen them make sample paints with paper. They put black paper on the table and with different designs and they put the screen on it and with the paper they get the impression to check it with the design, whether it is correct or not.

Q. Have you ever seen the merchandise in suit used for the process of screen painting?—A. In screen painting, yes.

Q. When you ordered the merchandise in suit what did you order?——

\*     \*     \*     \*     \*     \*     \*

A. I ordered it as bolting cloth. \* \* \*

Q. Under what name or names do you sell this merchandise in suit?——

\*     \*     \*     \*     \*     \*     \*

A. I sell it as bolting cloth, or sometimes we call it stencil cloth. *It is bolting cloth for stencil. They are the only two forms and two names we use in the trade.* [Italics supplied.]

By Mr. CARTER:

Q. I believe you stated you have been familiar with bolting cloth for twenty years; is that correct?—A. Yes.

Q. What are the requirements of bolting cloth? What physical requirements must it meet?—A. The bolting cloth must be of pure silk. It must have a certain degree of strength. I mean it must be strong. And it must be non-sagging. That means it must stay right whether it is wet or dry; I mean as far as physically possible.

\*     \*     \*     \*     \*     \*     \*

Q. To go back again to the requirements or the requisites of bolting cloth, is there any special requirement as to the uniformity of the spaces or the intercises [interstices] between the thread?—A. Yes. All bolting cloth, no matter what kind of weave, they all come in certain numbers according to the count per inch, or per linear inch, or per centimeter—sometimes it is per centimeter. The certain number corresponds to the certain count.

\*     \*     \*     \*     \*     \*     \*

X Q. Mr. Armaghanian, you say you don't know what gauze woven means?—A. Gauze woven? We never used that in our trade, "gauze woven."

X Q. And you don't know what leno means?—A. Leno means line. If it is line woven I can understand what it means.

X Q. Is there such a term used in your trade as "line woven?"—A. No.

X Q. That is not used in your trade?—A. I mean line woven. We have another word for it.

X Q. Beg pardon?—A. Not exactly the same word. We use "plain."

X Q. You say that you know what line woven means, but at the same time you say that term is not used in your trade.—A. We call it plain woven.

X Q. Do you know what taffeta woven means?—A. Taffeta woven means the same thing as plain woven.

X Q. What does that mean?—A. Plain woven.

X Q. What does plain weave mean?—A. Line weave.

X Q. What kind of a weave is plain weave or line weave?—A. Just a warp and a weft, I guess.

X Q. Just a warp and a weft and nothing else?—A. Yes.

X Q. Doesn't every piece of cloth have a warp and a weft and nothing else?—A. As a weave, from that standpoint, that is all that is necessary to get cloth.

X Q. How do you differentiate between plain woven and any other kind of weave?—A. There may be a dozen different kinds of weaves; Jacquard weave. I don't know. There are so many different kinds I hear about.

X Q. You hear about so many different kinds, but you don't know anything about plain woven.—A. I guess plain woven is one of the earliest weaves we had.

X Q. If you had a piece of cloth and looked at it could you tell whether it was plain woven or not?—A. If my eyes could see the weave, I could.

X Q. What would you see when you looked for a piece of cloth that was plain woven?—A. I would see lines.

X Q. You mean you would see the thread?—A. I could see the thread. I could see the mesh if there was any mesh.

X Q. What else?—A. That is all I can see with my plain eyes.

X Q. What would you have to see of the threads in order to determine that it was plain woven?—A. They have to run straight.

X Q. You mean in a straight line?—A. In a straight line.

X Q. Isn't it a fact that the warp thread in all fabrics run in a straight line?—A. I think they do.

X Q. Isn't it a fact the weft thread of every piece of woven fabric runs in a straight line?—A. Yes; but they don't all have mesh.

X Q. Can you tell me what plain woven means?—A. I have no definition.

The trial court held that the testimony of the appellee standing uncontradicted constituted a *prima facie* case in favor of importer's contentions, and sustained the protest, holding the merchandise to be dutiable at 30 per centum ad valorem under paragraph 1205, Tariff Act of 1930, as modified by the Swiss Trade Agreement as aforesaid.

It is the contention of the Government here that the witness showed himself to be unfamiliar with the characteristics of silk bolting cloth, and that his testimony fell short of proving that the collector was in error in finding, in effect, that the merchandise was not silk bolting cloth.

It will be observed that the term "silk bolting cloth" is a designation by use of the character that ordinarily requires, when classification is being considered, testimony of chief use at the time the language was used and became effective. In other words, it would be necessary to prove a chief bolting use of the class of cloth to which the importation belongs on and prior to said date. For reasons hereinafter stated, we think the testimony of the one witness of the importer made a *prima facie* case, as found by the trial court.

While the terms "bolting" and "bolt" may be most frequently applied in the milling art, we think the common meaning of the terms is broad enough to cover the sifting or separating of materials other than those produced by the milling art. In Webster's New International Dictionary (1932) we find the following:

bolt. 1. To sift or separate the coarser from the finer particles of, as bran from flour, by means of a bolter; to separate, assort, refine, or purify by other means.

Free list paragraph 1626 of the Tariff Act of 1930 reads as follows:

PAR. 1626. Bolting cloths composed of silk, imported expressly for milling purposes, and so permanently marked as not to be available for any other use.

This paragraph was expressly included in identical form, followed by the word "(Free)," in said trade agreement.

Paragraph 1626 calls for "bolting cloths" and enumerates the particular kind and condition of such cloths which Congress wished to free list. The trade agreement speaks of "silk bolting cloth." In the Dictionary of Tariff Information, 1924, "bolting cloth" was defined as follows:

Silk bolting cloth is a strong, fine, gauze-woven silk fabric used for sifting flour or other finely pulverized materials. For fine sifting it is absolutely necessary. Flour mills use 75 per cent of the bolting cloth, *and kindred industries, together with those extracting grit from certain chemicals, the remainder.* [Italics ours.]

On January 9, 1936, the date the Swiss Trade Agreement was signed, the Department of State analyzed the document, and in so doing referred to said paragraph 1205 and the modification of the same in the following language:

*Silk specialties.*—Under paragraph 1205 there are dutiable three types of silk specialties of which Switzerland is the principal supplier and on which reductions of duty have been made. The most important of these is leno-woven silk cloth, commonly called bolting cloth.

Silk bolting cloth imported expressly for milling purposes and so marked is free of duty. Such cloth has, however, recently acquired important uses in textile printing and in the sign painter's art. For these purposes it is subject to duties of 55 or 60 per cent, depending on width. Over 40 requests were received by the Committee for Reciprocity Information urging a reduction in these duties, and the agreement effects a reduction to 30 percent irrespective of width. Switzerland supplies the bulk of the world demand for this specialty which is a fine silk fabric woven with almost microscopic precision of hard-twist organzine. None is

produced in the United States. Imports from Switzerland of silk bolting cloth for milling purposes—bound on the free list—amount to upwards of $300,000 annually. Imports of the same cloth for the textile and sign painters' industries are not separately recorded, but are known to amount to only about 5 percent of that for milling purposes.

We think that the above statement of the Department of State, made under the circumstances related, should have consideration in determining the meaning to be given the controverted term. In the analysis of the Department of State, under the heading "Concessions granted by the United States to Switzerland" is the following:

1626. Silk bolting cloth for milling purposes. Free.

The number "1626," as used, indicates the number of the paragraph of the Tariff Act of 1930.

On page 40 of the same document, referring to paragraph 1205 of said tariff act, appears the following: "Silk bolting cloth other than for milling purposes." On page 35, in summarizing the industries to which the benefits of the agreement will enure, opposite "textile" is " 'Bolting' cloth for printing," and opposite "Sign and graphic art" is " 'Bolting' cloth."

The sole witness in the case, for many years prior to testifying, had had a vast experience in the importation of bolting cloths and stated that his main business was importing such cloths and that the instant importation was bolting cloth. The witness stated definitely that the cloth was used for "bolting or sifting," "for passing through liquids or paints or dyes or any liquid or near liquid or in powder form"; that the merchandise imported was all silk; that it was not sized and that "it is natural." It is true he stated that it was line woven and that "leno woven" meant line woven. He was of the opinion that the lines formed by the threads in the cloth at bar were straight, as distinguished from other cloths in which there were intermingled threads which were not straight and which threads would prevent the cloth from being porous and would prevent the same from having uniform interstices through which particles could pass.

Regardless of whether "leno-woven" in its strict technical sense means line-woven, the information the witness gave concerning leno cloth is not out of harmony with the facts stated in "Broad-Silk Manufacture and the Tariff," a report published by the United States Tariff Commission in 1926, where at page 122 is found the following:

LENO FABRICS.

The fabrics so far discussed in this group [specialties] * * * are woven with all the warp threads lying parallel to each other, and the patterns are produced by the order of interweaving of the perpendicular warp and filling threads, the threads being held in line in the cloth by the compactness of the interlacings. In open-mesh fabrics, known as lenos * * *. threads have to be secured against shifting by means that disturb the parallel alignment of warp ends and

the perpendicular character of the interlacings. Such fabrics are usually made with two distinct sets of warp threads—crossing, or douping, threads, and standard, or regular, threads. * * * *Gauze* is a very general term covering almost all open-mesh fabrics. In the silk industry, however, the term is confined almost exclusively to leno fabrics. * * * *Bolting cloth,* made with each alternate regular warp thread leno woven, is used for sifting flour and other cereal products.

At page 264 of said publication is found the following:

BOLTING CLOTH.

Silk bolting cloth, which is a strong, fine, leno-woven fabric used for sifting flour or other finely pulverized materials, is one of the few specialty staples imported from Europe. For fine sifting no satisfactory substitute has yet been found. * * *

* * * Weaving is done with the utmost care, so as to produce an absolutely even, strong, and elastic open-mesh fabric. Every second regular warp end seems to be tied in by a "douping" end, with the result that, notwithstanding the openness of the weave, all the threads are held firmly in line. * * *

The witness testified definitely that the merchandise was used in this country for screen painting and for the sifting of paint pigments and for many other things such as stencils through which paints are pressed and that it was always used on screens, the cloth being "made into a frame, always put on a frame" and *that it could not be used otherwise and was "not good for anything else."* [Italics ours.] He stated that bolting cloths must be of pure silk, must be strong, and must be non-sagging, whether wet or dry. He stated that by looking at a piece of cloth he could tell whether it was plain woven or not, that is to say, he could see the lines—the thread, the mesh and that if it was plain woven the threads of the cloth would run in a straight line.

The testimony of this witness was not weakened by cross-examination.

The Government, in urging the insufficiency of the testimony to overcome the presumption of correctness attending the classification of the collector, argues that the witness showed a lack of technical knowledge as to the meaning of certain terms used in the weaving art such as "gauze woven," "leno woven," etc. We are not impressed with the contention of the Government that the testimony of the witness should be rejected as insufficient to make a *prima facie* case, establishing that the cloth imported was bolting cloth and of the character of cloth which the State Department said had *"recently* acquired important uses in textile printing and in the sign painter's art." [Italics ours.] The testimony is positive that the imported merchandise was bolting cloth and that, in substance, for a long period of time the witness' main business was the importation of bolting cloth, and that such cloth as that at bar was fit only for bolting purposes. While the testimony is not as clear and definite in some of its phases as it might be, there is no conflict between any of the statements contained therein, and we think the facts testified to make a

*prima facie* case establishing the fact that on and prior to the date the term was used in the controverted provision merchandise of this class was chiefly used for bolting purposes and is the kind of bolting cloth provided for in modified paragraph 1205.

We must conclude, therefore, that the trial court correctly sustained the protest, and its judgment so doing is *affirmed*.